# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| SARANNE CANTRELL, | ) |
| Plaintiff, | ) |
| v. | ) No. 4:18-cv-00382-NKL |
| CHRISTOPHER CHRISTENSEN, | ) |
| Defendant. | ) |

## ORDER

Pending before the Court is Plaintiff Saranne Cantrell's motion for new trial, Doc. 170. This case was tried before a jury on July 14-15, 2020. Plaintiff seeks a new trial contending evidence was improperly admitted, defense counsel's arguments were improper, and the verdict was against the weight of the evidence. The Court denies the motion.

### I.     Background[1]

On the afternoon of March 18, 2015 Plaintiff Saranne Cantrell and Defendant Christopher Christensen were both operating vehicles westbound on NW Chipman Road in Jackson County, Missouri. Cantrell's vehicle stopped for a red light, and the front of Christensen's vehicle collided with the rear of Cantrell's vehicle. At the time of the collision Cantrell was completely stopped and Christensen had taken his foot off the pedal to start accelerating. Photos of the vehicles taken at the scene showed minor damage. Cantrell did not report physical injuries when the police arrived at the scene.

---

[1] On a motion for new trial the facts are viewed in the light most favorable to the jury verdict. *PFS Distribution Co. v. Raduechel*, 574 F.3d 580, 589 (8th Cir. 2009).

1

On the afternoon of the collision Cantrell visited the emergency room complaining of neck pain, and Dr. Bruns diagnosed her with a sprain. Dr. Bruns testified that cervical sprains typically resolve in eight weeks. Dr. Bruns also explained that Cantrell's cervical spine x-ray showed degenerative disc and facet disease unrelated to the accident. Cantrell had a long history of horseback riding and a previous diagnosis of fibromyalgia.[2]

A few weeks after the accident, Cantrell saw Dr. Chaplick, a pain management specialist. Dr. Chaplick ordered a cervical MRI. On the date of the appointment, Cantrell completed a pre-MRI screening form, where she wrote she was experiencing back and neck pain. After the MRI, the MRI Report itself, dated April 13, 2015, stated in the "History" section: "chronic neck pain." This notation is the focal point of Cantrell's motion for new trial. Doc 171.

Prior to trial, the parties stipulated to the foundation of the MRI Report and Cantrell's other medical records under the business records exception to the hearsay rule. Doc. 137, p. 2. Then, on the morning of trial, Cantrell argued that the "chronic neck pain" notation in the MRI Report was untrustworthy and sought redaction of that phrase. Cantrell pointed to other medical records which did not reflect neck pain and argued that this showed the notation was a mistake. Defense counsel argued that if he had known Cantrell would object to the notation, defense counsel would have subpoenaed the radiology technician to verify its trustworthiness. However, given the timing of Cantrell's objection, subpoenaing the technician was impossible and Christensen would be prejudiced by exclusion. The Court eventually admitted the unredacted MRI Report subject to Cantrell's objection.

---

[2] Cantrell had a history of low back pain, and degenerative disk disease, pre-dating the collision. At trial, she only claimed damages for her neck injury allegedly caused by the accident.

The MRI Report was one of many medical records put before the jury. Defense counsel referenced the MRI Report once during cross-examination and three times in his closing argument to suggest that Cantrell's neck pain pre-dated the collision and resulted from her chronic and degenerative conditions. Defense counsel also utilized other medical records during cross-examination and closing argument to argue that any neck injury that may have been sustained during the collision healed within a few months. For example, Christensen pointed to Cantrell's office visit to her physician a few months after the accident where she did not complain of neck pain. In closing argument, Christensen argued that no future surgeries were necessary and suggested a damage award of no more than $20,000.

Cantrell asked the jury to award $500,000 for future medical expenses and pain and suffering pertaining to her neck injury. She testified that she received three epidurals after the collision to relieve her neck pain. Cantrell stated that she stopped horseback riding, had difficulty sleeping, and was not able to interact with her family in the same way due to the pain. She contended that the collision caused broad-based disc protrusions with spinal cord compression which would require surgery. Cantrell's neurosurgeon, Dr. Hess, testified that the surgery would cost more than $50,000. After deliberating, the jury returned a verdict of $10,000 for Cantrell.

Two days after trial, Cantrell obtained an affidavit from Dr. Finn, the radiologist who performed the MRI. The affidavit states that Dr. Finn has no recollection of speaking with Cantrell before her MRI, and that sometimes ancillary histories are informally gathered from radiology technologists. Doc. 171-1, p. 1. Cantrell argues that this testimony further proves the untrustworthiness of the "chronic neck pain" notation on her MRI Report and bolsters her argument that the Court erred in admitting the evidence. Doc. 171, p. 8.

3

## II. Discussion

Rule 59 states that the Court may, on motion, grant a new trial on all or some of the issues after a jury trial for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The key issue is "whether a new trial is necessary to prevent a miscarriage of justice." *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 462 (8th Cir. 2013). "Absent error affecting the substantial rights of the parties, neither reversal nor a new trial is required." *E.I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1257 (8th Cir. 1980). The decision to grant a motion for new trial is within the trial court's discretion. *Howard v. Mo. Bone & Joint Ctr., Inc.*, 615 F.3d 991, 995 (8th Cir. 2010); *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996).

An erroneous evidentiary ruling warrants a new trial only when the evidence was so prejudicial that a new trial would likely produce a different result. *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 833 (8th Cir. 2005); *Moses.com Sec., Inc., v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1058-59 (8th Cir. 2005). The Court looks to all of the evidence in the record to evaluate whether the moving party has shown how exclusion of the contested evidence would have produced a different outcome. *Bevan v. Honeywell, Inc.*, 118 F.3d 603, 611-12 (8th Cir. 1997).

A new trial on the grounds that the verdict is against the weight of the evidence "is warranted when the outcome is against the great weight of the evidence so as to constitute a miscarriage of justice." *Bank of Am., N.A., v. JB Hanna LLC*, 766 F.3d 841, 851 (8th Cir. 2014). Trial courts are not at liberty to reweigh the evidence and "set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 465 (8th Cir. 2016). The assessment of damages is especially within the jury's sound

4

discretion when the jury must determine how to compensate an individual for an injury not easily calculable in economic terms. *EEOC v. Convergys Customer Mgmt. Group, Inc.*, 491 F.3d 790, 798 (8th Cir. 2007); *Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1193 (8th Cir. 2000)

### A. Whether the "Chronic Neck Pain" Notation in the MRI was Erroneously Admitted

The MRI and specifically the notation at issue is hearsay. Christensen argues that the business record exception applies. The business records exception permits records to be admitted if they are (a) made at or near the time by someone with knowledge, (b) the record was kept in the course of a regularly conducted activity of business, (c) making the record was a regular practice of that activity, (d) these conditions are shown by a custodian, and (e) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. Fed. R. Evid. 803(6). Here, Cantrell stipulated that the foundation for the admission of the medical records as a business record was satisfied, Doc. 137, p. 2. Thus the first four requirements have been established as a matter of law and the record is presumptively admissible unless Cantrell can show that the record is untrustworthy. *Shelton v. Consumer Products Safety Com'n*, 277 F.3d 998, 1010 (8th Cir. 2002) ("[O]nce the offering party has met its burden of establishing the foundational requirements of the business records exception, the burden shifts to the party opposing admission to prove inadmissibility by establishing sufficient indicia of untrustworthiness.").

When Cantrell first raised her objection to the MRI notation, she offered the radiological order from Dr. Chaplick, which did not reference chronic neck pain and the pre-MRI screening report which merely stated that Cantrell sought the MRI due to neck and back pain. Cantrell also stated that Dr. Chaplick in his deposition alluded to radiologists doing "that" so they could get

5

paid by insurance.  The Court assumes that the reference was to radiologists making false notations to get insurance payments, a serious allegation given the legal implications.  However, Cantrell never submitted to the Court that portion of Dr. Chaplick's deposition that was being alluded to, nor did any radiologist or any radiology technician ever suggest such a thing.  The Court eventually concluded that the MRI Report was admissible without redaction because it was for the jury to weigh any differences between the medical records.  *Amtrust Inc. v. Larson*, 388 F.3d 594, 600 (8th Cir. 2004) (holding that contradictory evidence goes to the weight to be given to the MRI Report, rather than its admissibility).  By themselves, these differences did not convince the Court that the MRI Report was untrustworthy.

In her motion for new trial, Cantrell offers two additional pieces of evidence to suggest the notation was untrustworthy: a July 17, 2020 affidavit from Dr. Finn, the radiologist who conducted the MRI, and an excerpt from a July 7, 2020 deposition of Dr. Chaplick, the pain management specialist who ordered Cantrell's MRI.  Doc. 171.  Dr. Finn's affidavit was obtained after trial and Cantrell may not use her motion for new trial "to introduce new evidence. . . that could have been offered or raised prior to entry of judgment."  *Parton v. White*, 203 F.3d 552, 556 (8th Cir. 2000).  Dr. Chaplick's testimony was obtained the week before trial but the portion of the deposition argued in the motion for new trial was not presented to the Court prior to the Court ruling on the admissibility of the MRI Report.  Cantrell has provided no argument that this testimony was not available before the evidence was shown to the jury and it is too late to rely on it now.

However, even if Cantrell had provided Dr. Finn's affidavit and Dr. Chaplick's testimony at trial, the Court would have remained unconvinced that the "chronic neck pain" notation was untrustworthy.  Dr. Finn's affidavit states that he did not speak with Cantrell on the date of her

6

appointment, and that sometimes ancillary histories are informally gathered by radiology technologists. Doc. 171-1, p. 1. Dr. Chaplick testified that he did not tell Dr. Finn that Cantrell had a history of chronic neck pain, and that his notes did not state that Cantrell suffered from chronic neck pain. Doc. 171-2, p. 3. But neither Dr. Finn's affidavit nor Dr. Chaplick's testimony state that the "chronic neck pain" notation was not gathered by the radiology technician or that the information was not provided by Cantrell during the collection of her medical history. Nor did either suggest that the MRI Report failed to conform with the normal method and circumstances for conducting and documenting MRIs. Thus, Dr. Finn's affidavit and Dr. Chaplick's testimony go to the weight of the "chronic neck pain" notation, and would not alter the Court's ruling on admissibility. *Amtrust Inc.*, 388 F.3d at 600; *Shelton*, 277 F.3d at 1010.

The cases cited by Cantrell in support or her position do not convince the Court to reach a different outcome. In *Stull*, the hospital record at issue stated that "apparently [the plaintiff] jumped off the lawn mower." *Stull v. Fuqua Industries, Inc.*, 906 F.2d 1271, 1273 (8th Cir. 1990). The Eight Circuit reasoned that the word "apparently … indicates that the statement about jumping off the mower may not have been made by" the plaintiff. *Id.* at 1274. There is no similar evidence here that Cantrell did not provide the information. Cantrell stipulated that the MRI Report was made at or near the time by someone with knowledge …in the course of a regularly conducted activity of the business. *See* Fed. R. Evid. 803(6). A logical inference from this is that it was made by the radiology technician who obtained the statement from Cantrell since it was recorded as patient history.[3] Further, the Eighth Circuit found in *Stull* that the trial

---

[3] Cantrell's implied out-of-court statement would be admissible as a statement of a party opponent, Fed. R. Evid. 801(d)(2)(A), or as a medical history, Fed. R. Evid. 803(4).

7

court did not abuse its discretion by excluding evidence. This is consistent with the rule that a trial judge has wide discretion to determine whether the source of information, or the method or circumstances of preparation, indicate a lack of trustworthiness. *U.S. v. Page*, 544 F.2d 982, 987 (8th Cir. 1976). Cantrell also relies on *Petrocelli v. Gallison*, 679 F.2d 286 (1st Cir. 1982). *Petrocelli* is distinguishable because the party opposing the evidence did not stipulate to the foundation of the business record and the opinion is dependent on unique facts so different from the facts in this case that there is no logical parallel. *Id.* at 291. Further, the First Circuit affirmed the trial court's exclusion of the hearsay, again reflecting the discretion afforded trial courts.

Finally, even if the evidence was erroneously admitted, Cantrell has not demonstrated that exclusion of the "chronic neck pain" notation would have likely produced a different jury verdict warranting a new trial. *Diesel Mach., Inc.*, 418 F.3d at 833 ("An allegedly erroneous evidentiary ruling does not warrant a new trial unless the evidence was so prejudicial that a new trial would likely produce a different result."). There was ample evidence before the jury that Cantrell's injuries from the collision had healed and that she was exaggerating her damages. Cantrell has not shown that in the absence of the MRI notation, there would have been a more favorable outcome. Substantial evidence exists in Cantrell's case that supports the jury's $10,000 award. For example, photographs from the collision show only minimal damage to both vehicles, and the accident report indicates that Cantrell did not report an injury to the police officer at the scene. Dr. Bruns, the emergency room doctor, diagnosed Cantrell with a neck sprain and testified that neck sprains heal in approximately eight weeks. He recommended following up with a primary care physician within two days, but Cantrell followed up within a few weeks. Three months after the collision, Cantrell did not complain of neck pain when

8

visiting her pain management specialist. Dr. Bruns further testified that after a sprain injury heals, a degenerative condition could remain present and later become symptomatic. Dr. Hess, Cantrell's neurosurgeon, testified that degenerative disk disease, which is commonly present in women Cantrell's age, can cause pain, and the pain can worsen over time. The jury also heard testimony about Cantrell's pre-collision diagnoses, such as chronic pain syndrome and fibromyalgia. Cantrell and Christensen both put numerous medical records before the jury, only one of which indicated "chronic neck pain" in the "History" section. Cantrell had ample opportunity to emphasize this point during direct examination and redirect, and she testified that she did not recall telling her primary care physician that she had neck pain prior to 2015. *See Bevan*, 118 F.3d at 612 (explaining how the party opposing the contested evidence "took full advantage of its opportunity to impeach the validity, impact, and meaning of the" evidence); *McElgunn v. CUNA Mt. Group*, 2009 WL 1514398, *1 (D.S.D. May 27, 2009) (finding that the party opposing the contested evidence had ample opportunity to rebut any arguments or further explain important details within the document and thus would not be prejudiced by admission).

## B. Whether Defense Counsel Made Improper Arguments

Cantrell next argues that she was unfairly prejudiced by defense counsel's allegedly improper and misleading arguments to the jury pertaining to the "chronic neck pain" notation. Doc. 171, p. 11. Specifically, Cantrell argues that because defense counsel knew that the notation was untrustworthy his use of the notation to promote an unsupported argument during cross-examination and closing argument warrants a new trial. *Id.*

Importantly, the "chronic neck pain" notation was properly admitted so there can be nothing improper about defense counsel pointing to the evidence during trial. Further, there was nothing improper about how the properly admitted evidence was discussed. During cross-

9

examination, defense counsel asked Cantrell about a variety of her medical records, including the MRI Report.  With each record he asked her to verify some aspect of the document, as with the MRI Report he asked her whether it stated "chronic neck pain."  After Cantrell answered affirmatively, defense counsel ended his cross-examination.  Defense counsel did not emphasize the "chronic neck pain" notation any more than he emphasized other parts of Cantrell's medical history, and Cantrell has not demonstrated how this single question substantially influenced the jury's verdict.  Asking a question about an admitted piece of evidence, in the context of asking similar questions about similar evidence, does not constitute prejudicial injury warranting a new trial.  *U.S. v. Drapeau*, 414 F.3d 869, 875 (8th Cir. 2005) (finding that trial judges retain "wide latitude" to either limit or allow cross examination based on concerns about prejudice).  *Cf. U.S. v. Jasso*, 701 F.3d 314, 317 (8th Cir. 2012) (imposing limits on cross-examination that prejudiced the defendant and confused the issues before the jury).

During closing argument, the Court may grant counsel wide latitude in arguing inferences from admissible evidence.  *Bennett v. Nucor Corp.*, 656 F.3d 802, 813 (8th Cir. 2011); *Ratliff v. Schiber Truck Co.*, 150 F.3d 949, 957 (8th Cir. 1998).  However, counsel must not "go beyond the evidence and issues drawn by the instructions or urge prejudicial matters."  *Ratcliff*, 150 F.3d at 957 (quoting *Titsworth v. Powell*, 77 S.W.2d 416, 422 (Mo.Ct. App. 1989)).  "In ruling on the propriety of final argument, the challenged comment must be interpreted in light of the entire record rather than in isolation."  *Id.*  (quoting *Titsworth*, 77 S.W.2d at 422).  A new trial should only be granted where improper conduct of counsel in closing argument is "plainly unwarranted and clearly injurious."  *Glister v. Primebank*, 747 F.3d 1007, 1010 (8th Cir. 2014).

During closing argument, defense counsel used the term "chronic neck pain" four times: three times in reference to the MRI Report and once to argue that Cantrell did not present with

10

chronic neck pain a few months after the accident. Pertaining to the MRI Report, defense counsel urged the jury to remember Dr. Bruns' testimony about the term chronic, and argued that some of Cantrell's medical records were inconsistent in documenting when her back pain began and that perhaps the medical records were also inconsistent in documenting her neck pain. In making these arguments defense counsel emphasized portions of the evidence that supported Christensen's theory of the case. *Ratliff*, 150 F.3d at 957 (permitting closing argument that was supported by the record); *Glister*, 747 F.3d at 1010; *Cook v. City of Bella Villa*, 582 F.3d 840, 857 (8th Cir. 2009). Moreover, the bulk of defense counsel's closing argument focused on evidence of Cantrell's persistent back pain pre-dating the accident and evidence which could suggest that the neck sprain healed eight weeks after the collision. Looking at the entire record, the Court finds that defense counsel did not place undue focus on the "chronic neck pain" notation, and that counsel's arguments fell well within the wide latitude of permissible inferences. *Ratliff*, 150 F.3d at 957. Defense counsel utilized an admitted exhibit during closing argument, which does not warrant a new trial. *Glister*, 747 F.3d at 1010.

### C. Whether the Verdict was Against the Weight of the Evidence

Cantrell next argues that the jury's verdict was against the weight of the evidence. Doc. 171, p. 14. Trial courts are not at liberty to reweigh the evidence and "set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Lincoln Composites*, 825 F.3d at 465. The ultimate test is "whether there has been a miscarriage of justice." *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992). A miscarriage of justice occurs when the jury's verdict is against the "great weight" of the evidence. *Jones v. TEK Industries, Inc.*, 319 F.3d 355, 358 (8th Cir. 2003); *Lloyd v. Am. Airlines, Inc.*, 291 F.3d 503, 508-09 (8th Cir. 2002). Finally, where reasonable people "can

11

differ in evaluating credible evidence, a new trial on the ground of weight of the evidence should not be granted." *White*, 961 F.2d at 781.

Cantrell and Christensen provided two different evaluations of Cantrell's injury caused by the collision. Cantrell testified that she did not experience neck pain until after the collision. She stated that she received three epidurals after the collision to alleviate the neck pain, and attended several physical therapy sessions but ultimately stopped attending because she thought the sessions weren't reducing her pain. Cantrell testified that she stopped horseback riding, had difficulty sleeping, and was not able to interact with her family in the same capacity due to the pain. She stated that she experienced pain in her neck and shoulders, numbness, difficulty sitting, and that she wanted the recommended surgery to relieve the pain. Cantrell's neurosurgeon, Dr. Hess, testified that the future recommended surgery would cost more than $50,000. On cross-examination, Dr. Hess opined that a hospital in St. Louis charged $380,000 for two similar surgeries. Ultimately, Cantrell sought damages for future medical expenses and pain and suffering related to her neck injury, and asked the jury to award more than $500,000.

It is within the purview of the jury to weigh the evidence presented and determine an appropriate damages award. *Lincoln Composites*, 825 F.3d at 465; *Convergys Customer*, 491 F.3d at 798. Presumably, the jury did not find that the evidence supported a $500,000 verdict. However, the jury's $10,000 verdict also does not go against the "great weight" of the evidence. *Jones*, 319 F.3d at 358. Dr. Hess, the neurosurgeon, opined that women Cantrell's age commonly have degenerative disc disease which can cause pain without trauma. Three months after the collision, the pain management specialist stated that Cantrell presented with back pain and did not have radicular pain after her epidurals in April 2015. Dr. Bruns, the emergency room doctor, testified that a neck sprain usually resolves within eight weeks. He further stated that a

person with a degenerative condition in the cervical spine, such as Cantrell, could experience pain after a sprain healed.  This evidence supports the jury's verdict because it suggests Cantrell's injury from the collision resolved within a few months and thus her pain and suffering warranted a relatively minimal damages award.  The jury was presented with two evaluations of the evidence and selected a damages amount, and thus it cannot be said that the $10,000 verdict goes against the great weight of the evidence warranting a new trial.[4]  *Lincoln Composites*, 825 F.3d at 465; *Jones*, 319 F.3d at 358; *White*, 961 F.2d at 781.

### III. Conclusion

Plaintiff's motion for new trial, Doc. 170, is denied.

/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: November 30, 2020
Jefferson City, Missouri

---

[4] Cantrell argues that the jury had no other option but to award her damages because the parties stipulated to Christensen's negligence.  Doc. 171, p. 14.  However, stipulation as to negligence does not guarantee an award of damages.  *Spears v. Hough*, 458 F.2d 529, 531 (8th Cir. 1972) (holding that when a jury finds for plaintiff a jury may also assess the damages as "none"); *Haley v. Byers Transp. Co.*, 394 S.W.2d 412, 417 (Mo. 1965) (upholding a verdict in favor of plaintiff where the jury awarded zero damages).